1  Craig A. Brandt (SBN 133905)
   LAW OFFICE OF CRAIG A. BRANDT
2  5354 James Avenue
   Oakland, CA  94618
3  Telephone: (510) 601-1309
   Email:  craigabrandt@att.net
4
   Attorney for Plaintiff
5  EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

6                 UNITED STATES DISTRICT COURT

7               NORTHERN DISTRICT OF CALIFORNIA

8

9  EDEN ENVIRONMENTAL CITIZEN'S        )  Case No: _____
   GROUP, LLC, a California limited liability )
   company,                           )  **COMPLAINT FOR INJUNCTIVE AND**
                                      )  **DECLARATORY RELIEF, CIVIL**
10              Plaintiff,            )  **PENALTIES AND REMEDIATION**
                                      )
11         vs.                        )
                                      )  **(Federal Water Pollution Control Act, 33**
12  WEST COAST METALS, INC., as a      )  **U.S.C. §§1251 et seq.)**
    corporation organized and existing under the )
13  laws of the State of California, and DOES 1- )
    10, inclusive,                    )
14              Defendant.            )
                                      )
15  _____  )

16        Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

17  brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

18  Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

19                          **INTRODUCTION**

20     1.     This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and

21  remediation against Defendant for current and ongoing violations of the National Pollutant

22  Discharge Elimination System ("NPDES") permit requirements of the CWA.

23

24

1        2.      On or about February 1, 2022, EDEN provided a Notice of Defendant's violations to

2    Defendant West Coast Metals, Inc. ("WEST COAST METALS"), by certified mail as required

3    by the CWA. 33 U.S.C. § 1365(b)(1)(A). The Defendant's base of operations is located at 470

4    Caletti Avenue, Windsor, California (Facility").

5        3.      On or about January 29, 2022, EDEN provided a Notice of Defendant's violations of

6    the CWA to the (1) Administrator of the United States Environmental Protection Agency

7    ("EPA"), (2) EPA's Regional Administrator for Region Nine, and (3) Executive Director of the

8    State Water Resources Control Board ("State Water Board").

9        4.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and hereby

10   incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File

11   Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

12       5.      More than sixty days have passed since EDEN's Notice was properly and lawfully

13   served on Defendant, the State Board, and the Regional and National EPA Administrators.

14   EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the

15   State of California has commenced or is diligently prosecuting a court action to redress the

16   violations alleged in this complaint. This action's claim for civil penalties is not barred by any

17   prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. §

18   1319(g).

19                   **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

20       6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section

21   1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief

22   requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C.

23

24

sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

7.     The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

8.     By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

9.     Venue is proper because Defendant reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

10.     Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

11.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from

environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

12.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

13.     EDEN has members that reside, work and pursue recreational activities near the affected Receiving Waters. The Facility discharges storm water into a municipal storm drain system which then discharges to the Mark West Creek, a tributary of the Russian River. The Russian River is the "Receiving Waters" for the Facility and is listed for water quality impairment under the Clean Water Act, Section 303(d) - list for dissolved oxygen, mercury, bacteria, temperature and pathogen impairments.  Eden members use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

14.     EDEN has standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to Sue.

15.     Specifically, the individual member(s) who are experiencing harm from Defendant's violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 13, above, due to the pollution caused by Defendant's environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

16.     Defendant's ongoing violations of the California Industrial General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

17.     EDEN is informed and believes, and on such information and belief alleges, that Defendant WEST COAST METALS located at 470 Caletti Avenue, Windsor, California, was formed on or about April 4, 1978, as a corporation organized and existing under the laws of the State of California.

18.     EDEN is informed and believes, and on such information and belief alleges, that, Defendant WEST COAST METALS, on or about July 30, 2004, submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility. EDEN is further informed and believes, and on such information and belief alleges, that on or about June 9, 2015, Defendant WEST COAST METALS, submitted an NOT to be authorized to discharge storm water from the Facility under the California Industrial General Permit ("General Permit") and

1   was assigned Waste Discharger Identification number ("WDID") 1 491018939, according to the

2   Regional Water Board's records.

3   **STATUTORY BACKGROUND**

4   19.    Congress declared that the Federal Clean Water Act was designed to "restore and

5   maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

6   and state cooperation to develop and implement "programs for preventing, reducing, or

7   eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

8   20.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant

9   into waters of the United States, unless such discharge is in compliance with various enumerated

10  sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by,

11  or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33

12  U.S.C. § 1342.

13  21.    Section 402(p) of the Act establishes a framework for regulating municipal and

14  industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with

15  approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

16  water discharges through individual permits issued to dischargers or through the issuance of a

17  single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

18  1342(p).

19  22.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S.

20  EPA has authorized California's State Board to issue NPDES permits including general NPDES

21  permits in California.

22

23

24

<u>General Permit</u>

23.     The State Water Board elected to issue a statewide general permit for industrial storm water discharges. The State Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State WATER Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015. The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25.     The General Permit contains several prohibitions. Effluent Limitation Section V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

26.     Receiving Water Limitation Section VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of

any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

28.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X(B).

30.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I (1).

31.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X(H)(4), (5).

34.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness

1   of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out

2   in the SWPPP are adequate and properly implemented.

3   36.   Section XI(B) of the General Permit requires that Dischargers collect and analyze storm

4   water samples from two qualifying storm events ("QSEs") during the first half of each reporting

5   year (July 1 to December 31) and two QSEs during the second half of each reporting year

6   (January 1 to June 30), and that the samples be collected from all outfalls identified in the

7   Facility SWPPP.

8   37.   A QSE is a precipitation event that produces a discharge for at least one drainage area

9   and is preceded by 48 hours with no discharge from any drainage area. General Permit Section

10   XI(B)(2)

11   38.   Once the storm water samples have been collected, the General Permit requires that the

12   Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection

13   (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports

14   within 30 days from receipt of the report. General Permit Section XI(B)(4)

15   39.   Facilities are also required to make monthly visual observations of storm water

16   discharges. The visual observations must represent the quality and quantity of the facility's storm

17   water discharges from the storm event. General Permit, Section XI(A)

18   40.   The General Permit requires operators to conduct an Annual Comprehensive Facility

19   Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs

20   and the need for additional BMPs based on visual observations and sampling and analysis

21   results. General Permit, Section XV.

22   41.   Under the General Permit, facilities must analyze storm water samples for pH, oil &

23   grease and total suspended solids, as well as additional parameters indicated in the Permit by

24

facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI(B)(6)(c).

42.     The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

43.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

44.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

45.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII(A)

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable

NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII(C)

47.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit Section XII(D)

48.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

49.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than

1    $10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act

2    section 309(c)(4)

3            North Coast Region Basin Water Quality Control Plan

4      51.    The Water Quality Control Board for the North Coast Region has adopted the "North

5    Coast Region Basin Water Quality Control Plan" ("Basin Plan"), as initiated by Resolution No.

6    68-16, setting forth a "Statement of Policy With Respect to Maintaining High Quality of Waters

7    in California." The Basin Plan has subsequently been amended several times (Basin Plan

8    Appendix 1), and delineates the Water Quality Standards ("WQS") and beneficial uses for the

9    waters of the Russian River and its tributaries, including Mark West Creek.

10     52.    The Beneficial Uses for the Russian River and Mark West Creek include, among others,

11   sport fishing, fish migration, navigation, preservation of rare and endangered species, water

12   contact and noncontact recreation, fish spawning, and wildlife habitat. *See*, Basin Plan Table 2-1:

13   Russian River, 114.10 (lower), 114.20 (middle), 114.30 (upper); Mark West Creek, 114.23.

14     53.    The Russian River is home to, among others, the Central California Coho Salmon,

15   California Coastal Chinook Salmon and steelhead trout. The Coho salmon found in the Russian

16   River are listed under both the State and the Federal Endangered Species Acts. Coastal Chinook

17   salmon in the Russian River are listed as Endangered under the Federal Endangered Species Act.

18   Steelhead trout found in the Russian River are listed as Threatened under the Federal Endangered

19   Species Act.

20     54.    The Mark West Creek is one of five priority stream systems selected as part of the

21   California Department of Fish and Wildlife water quality study effort. *See*, *Mark West Creek*

22   *Study (Sonoma County)* at https://wildlife.ca.gov/Conservation/Watersheds/Instream-

23   Flow/Studies/Mark-West-Creek-Study.

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 13

The Mark West Creek is located within Sonoma County and its 59 square mile watershed is the second largest sub-watershed in the Russian River basin. The creek supports several fish species including California Coastal Chinook Salmon, Central California Coast Coho Salmon and steelhead trout. Salmonid populations within Mark West Creek and other Russian River tributaries have declined significantly. Coho Salmon, in particular, neared extinction within the Russian River basin in the late 1990s, and their recovery is now supplemented by captive brood stock efforts that include juvenile releases into Mark West Creek. *Ibid.*

55.     The confluence of Mark West Creek and the Russian River supplies clean drinking water to nine cities and water districts that serve more than 600,000 residents in portions of Sonoma and Marin counties. *See*, Sonoma County Water Agency at https://sonomawater.org/quick-facts; and Russian River Coho Water Resources Partnership at https://cohopartnership.org/home/watersheds/mark-west-creek/

56.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

57.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

58. The Basin Plan sets forth, among other things, narrative WQS for chemical constituents, floating material, Oil and Grease ("O&G"), pH at 6.5 – 8.5, sediment, settleable material, and suspended material. *See*, Basin Plan §§ 3.3.3, 3.3.7, 3.3.9, 3.3.11, 3.3.12, and 3.3.13.

59. The Basin Plan also incorporates by reference California's maximum contaminant levels for several inorganic chemicals including aluminum, arsenic, mercury, nickel, nitrate + nitrite, and zinc. *See,* Cal. Code of Regs. tit. 22, § 64431, Table 64431-A, Inorganic Chemicals and § 64449, Table 64449-A, Consumer Acceptance Contaminant Levels.

60. The CTR standards are an applicable WQS under the General Permit. *Santa Monica Baykeeper v. Kramer Metals, Inc*. 619 F. Supp. 2d 914, 925-26; *see also, Defenders of Wildlife v. Brower*, 191 F. 3d 1159, 1166-67 (9th Cir. 1999) (industrial storm water discharges must strictly comply with water quality standards). The CTR promulgates numeric criteria to protect human health and the environment in the State of California. 40 C.F.R. § 131.38.

61. Where more than one water quality objective exists for the same water quality parameter, the objective protective of the most sensitive beneficial use applies. *See*, Basin Plan, Water Quality Objectives, § 3.1.1.

62. Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

### Water Quality Impairment Area

63. The Russian River and Mark West Creek are listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for sediment and temperature. Portions of the Russian River watershed are impaired for dissolved oxygen, mercury, bacteria, temperature and pathogen impairment. Mark West Creek is also impaired for aluminum, dissolved oxygen,

1    phosphorous and manganese. *See*, California Department of Fish and Wildlife, *Study Plan:*

2    *Habitat and Instream Flow Evaluation for Anadromous Steelhead and Coho Salmond in Upper*

3    *Mark West Creek*, p. 26.)

4        Citizen Suit Provision of the CWA

5    64.    Under the CWA, any citizen may commence a civil action against any person who is

6    alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued

7    by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be

8    commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to

9    the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any

10   alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a

11   citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the

12   CWA would be enforced, either by the United States government or by concerned citizens.

13   65.    In furtherance of the water preservation goals established by the CWA, the citizen suit

14   provision confirms the district court's jurisdiction to apply any appropriate civil penalties under

15   section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any

16   permit condition or limitation implementing any of such sections in an NPDES permit shall be

17   subject to a civil penalty not to exceed $46,192 per day for each violation occurring before

18   November 2, 2015, and $51,570.00 per day per violation for violations occurring after November

19   2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

20   66.    Violations of provisions of the General Permit, including those detailed below,

21   constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33

22   U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

23

24

1

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

2   67.     Defendant WEST COAST METALS is an establishment that is primarily engaged in

3   refuse and recycling collection, and disposal Facility.

4   68.     EDEN is informed and believes that the Facility falls within the standard industrial

5   classification ("SIC") 5093 – Scrape and Waste Materials.

6   69.     The Facility discharges storm water into a municipal storm drain system which then

7   discharges to the Mark West Creek, a tributary of the Russian River that is the "Receiving

8   Waters" for the Facility.

9   70.     EDEN is informed and believes that WEST COAST METALS stores industrial

10  materials outdoors that can be exposed to storm water, eroded by wind, and otherwise

11  contaminate the surrounding watershed.

12  71.     EDEN is informed and believes that based on its investigation, including a review of the

13  Regional Water Board's records, aerial photography storm water is collected and discharged

14  from the Facility through a series of channels that discharge via at least one outfall.  The outfall

15  discharges storm water and pollutants contained in that storm water that eventually discharges

16  into the Russian River, a navigable Water of the United States.

17  72.     EDEN is informed and believes, and thereupon alleges that the storm water flows over

18  the surface of the Facility where industrial activities occur and areas where airborne materials

19  associated with the industrial processes at the Facility may settle onto the ground.  EDEN is

20  informed and believes, and thereupon alleges that storm water flowing over these areas collects

21  suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water

22  channels.

23

24

73.     On information and belief, EDEN alleges that there are insufficient structural storm water control measures installed at the Facility.  EDEN is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP and Site Map

74.     On information and belief, EDEN alleges that since at least the beginning of the Facility's operations, Defendant WEST COAST METALS has failed to develop an adequate SWPPP and a Site Map for the Facility, a violation of the General Permit, sections X, X(B), and XII(C)(2)(a).

75.     On information and belief, EDEN alleges that the Facility has failed to include the minimum required components of a Site Map and to upload an adequate SWPPP pursuant to the General Permit as detailed in EDEN's 60-Day Notice attached hereto as Exhibit A and incorporated herein by reference. *See*, Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

Monitoring and Reporting Program – Monthly Visual Observations

76.     On information and belief, EDEN alleges that Defendant WEST COAST METALS does not have an adequate storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by Section XI.A of the General Permit.

77.     On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

1    78.  Information available to EDEN indicates that as a result of these practices, storm water

2    containing excessive pollutants is being discharged during rain events from the Facility to the

3    Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the

4    Facility.

5        Failure to Collect and Analyze The Required Number of Storm Water Samples

6    79.    The Defendant WEST COAST METALS is required to collect and analyze two storm

7    water samples from the first half of the reporting year and two storm water samples for the

8    second half of the reporting year.

9    80.    On information and belief, Eden alleges that Defendant failed to collect and analyze the

10   required number of storm water samples at the Facility since at least the beginning of the

11   Facility's operations, as required by the General Permit, sections XI.B2 and XI(B)(11)(a) .

12   81.    On information and belief, EDEN alleges that during the 2015-2016 reporting year,

13   Defendant failed to collect and analyze one storm water sample from the first half of the

14   reporting year.

15   82.    On information and belief, EDEN alleges that during the 2017-2018 reporting year,

16   Defendant failed to collect and analyze two storm water sample from the first half of the

17   reporting year.

18   83.    On information and belief, EDEN alleges that during the 2018-2019 reporting year,

19   Defendant failed to collect and analyze one storm water sample from the first half of the

20   reporting year.

21   84.    On information and belief, EDEN alleges that during the 2019-2020 reporting year,

22   Defendant failed to collect and analyze one storm water samples from the first half of the

23   reporting year.

24

85.     On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze two storm water samples from the first half of the reporting year.

| Reporting Year | QSE's Sampled In First Half | QSE's Sampled In Second Half |
|---|---|---|
| 2015-16 | 1 | 3 |
| 2016-17 | 2 | 2 |
| 2017-18 | 0 | 3 |
| 2018-19 | 1 | 3 |
| 2019-20 | 1 | 3 |
| 2020-21 | 0 | 2 |
| Total Sampled | 5 | 16 |
| QSE's Required | 12 | 12 |
| **QSE's Missing** | **7** | 0 |

86.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

<u>Failure to Collect Storm Water Run-Off Samples During Qualified Storm Events</u>

87.     On information and belief, EDEN alleges that Defendant has taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that storm water samples be preceded by a period without a discharge.  Under the General Permit a Qualified Storm Event ("QSE") is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

88.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on December 30, 2015 was not a valid QSE because there was no recorded rainfall (.02") on that date in violation of the General Permit.

89.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on February 24, 2016 was not a valid QSE because there was no recorded rainfall on that date in violation of the General Permit.

90.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on November 23, 2016 was not a valid QSE because it was made on the second consecutive day of rainfall, in violation of the General Permit.

91.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on March 6, 2017 was not a valid QSE because it was made on the third consecutive day of rainfall, in violation of the General Permit.

92.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on March 20, 2017 was not a valid QSE because it was not preceded by 48 hours of no discharge.

93.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on March 2, 2018 was not a valid QSE because it was made on the third consecutive day of rainfall, in violation of the General Permit.

94.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on February 4, 2019 was not a valid QSE because it was made on the sixth consecutive day of rainfall, in violation of the General Permit.

95.   On information and belief, EDEN alleges that Defendant's collection of storm water samples on May 13, 2020 was not a valid QSE because it was made on the third consecutive day of rainfall, in violation of the General Permit.

96.   On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 16, 2021 was not a valid QSE because there was no recorded rainfall on that date in violation of the General Permit.

97.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

Failure to Upload Storm Water Sample Analyses Within Thirty (30) Days

98.   On information and belief, EDEN alleges that Defendant failed to upload into SMARTS all storm water sampling and analytical results within 30 days for each sampling event, a violation of the General Permit.

99.   On information and belief, EDEN alleges that the following results were more than thirty (30) days late:

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Length of Days Late |
|---|---|---|---|
| 12/30/2015 | 01/21/2016 | 04/15/2016 | 55 |
| 01/13/2016 | 02/01/2016 | 04/15/2016 | 44 |
| 02/24/2016 | 03/03/2016 | 04/15/2016 | 13 |
| 11/23/2016 | 12/19/2016 | 07/13/2017 | 176 |
| 12/14/2016 | 01/16/2017 | 07/13/2017 | 148 |
| 03/06/2017 | 04/03/2017 | 07/13/2017 | 71 |
| 03/20/2017 | 04/24/2017 | 07/13/2017 | 50 |
| 01/08/2017 | 01/22/2018 | 07/12/2018 | 141 |
| 03/02/2018 | 03/28/2018 | 07/12/2018 | 76 |
| 03/12/2018 | 03/28/2018 | 07/12/2018 | 76 |
| 03/21/2018 | 04/03/2018 | 07/12/2018 | 70 |

| 11/27/2018 | 12/17/2018 | 03/22/2019 | 65 |
| 03/20/2019 | 04/09/2019 | 05/16/2019 | 7 |
| 12/18/2019 | 01/08/2020 | 07/14/2020 | 158 |
| 01/16/2020 | 02/03/2020 | 07/14/2020 | 132 |
| 03/24/2020 | 04/08/2020 | 07/14/2020 | 67 |
| 05/13/2020 | 05/29/2020 | 07/14/2020 | 16 |
| 01/06/2020 | 01/22/2021 | 07/14/2021 | 143 |
| 03/08/2021 | 03/24/2021 | 07/14/2021 | 82 |

<u>Failure to Analyze Storm Water Samples for Correct Parameters – No pH</u>

100.    On information and belief, EDEN alleges that all of Defendant failed to analyze storm water samples for the parameter pH in violation of the General Permit.

101.    On information and belief, EDEN alleges Defendant failed to have storm water samples analyze for pH on the following dates:

| **Sample Date** | **Missing Parameter** |
| --- | --- |
| 12/30/2015 | pH |
| 01/13/2016 | pH |
| 02/24/2016 | pH |
| 04/22/2016 | pH |
| 11/23/2016 | pH |
| 03/21/2018 | pH |
| 02/04/2019 | pH |

102.    On information and belief, EDEN alleges Defendant did not include the parameter pH in the Laboratory Reports or in the Chain of Custody Reports

103.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

1        Falsification of Annual Reports

2        104.  EDEN is informed and believes that Defendants have submitted falsified Annual

3  Reports to the Regional Water Quality Control Board in violation of Sections XXI.L and XXI.N

4  of the General Permit.

5        105.  Section XI.B of the General Permit provides that the Facility must collect and analyze

6  two storm water samples in the first half of each reporting year, and two samples in the second

7  half of each reporting year.  However, as discussed above, Defendant failed to collect and

8  analyze all the required storm water samples during the reporting years.

9        106.  On July 12, 2018, July 11, 2019 and July 14, 2020 Defendant submitted its Annual

10  Reports for the Fiscal Years 2017-18, 2018-19 and 2019-20. Mr. Jack Gardner signed the Annual

11  Reports for the reporting years under penalty of perjury as the Designated Authorized

12  Representative.

13        107.  Mr. Gardner responded "Yes" to Question No. 3 on their Annual Reports ("Did you

14  sample the required number of Qualifying Storm Events during the reporting year for all

15  discharge locations, in accordance with Section XI.B?")  However, as noted above, Defendant

16  has failed to collect and analyze all the required storm water samples during reporting years.

17        108.   If a Facility does not collect four storm water samples during a particular reporting

18  year, the reporting requirements of the General Permit require the Facility to indicate "NO" to

19  Question NO. 3 on the Facility Annual Report and to provide an explanation for why the

20  required number of samples were not collected. The explanation as to why there were

21  insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

22        109.  Records from the National Oceanic and Atmospheric Administration (NOAA)

23  website/database and the weather station at Santa Rosa Sonoma County Airport confirm that

24

during the reporting years at issue, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant to collect the requisite number of samples. Further, there were other Facilities near the Defendant's Facility that were able to collect the required number of storm water samples during the Reporting Years.

110.   Based on the foregoing, it is clear that Defendant's DARs intentionally made false statements in the Facility's Annual Reports when they indicated that the Facility had collected samples according to Section XI.B of the General Permit during the reporting years when in fact the Facility did not collect the required number of samples.

Discharges of Contaminated Storm Water

111.   Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges in violation of the General Permit.

112.   Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.  These pollutants include storm water contaminated with pH affected substances, oil & grease ("O&G"), total suspended solids ("TSS") Aluminum, Copper Iron and Zinc.

Aluminum Exceedances

113.   For the Reporting Years 2015-16 the levels of Aluminum at 1.080 mg/L in storm water detected by the Facility has exceeded the benchmark value and annual NAL for Aluminum of 0.75 mg/L established by EPA and the State Water Board. For the Reporting Year 2016-17 the

Aluminum level at the Facility was measured at 2.613 mg/L which is over the benchmark value and annual NAL for Aluminum. For the Reporting Year 2017-18 the Aluminum level at the Facility was measured at 0.839 mg/L which is over the benchmark value and annual NAL for Aluminum. For the Reporting Year 2018-19 the Aluminum level at the Facility was measured at 0.785 mg/L which is over the benchmark value and annual NAL for Aluminum. For the Reporting Year 2019-20 the Aluminum level at the Facility was measured at 4.339 mg/L which is over the benchmark value and annual NAL for Aluminum. For the Reporting Year 2020-21 the Aluminum level at the Facility was measured at 2.260 mg/L which is over both the Basin Plan's parameters for Aluminum and those established by EPA and the State Water Board for Aluminum.

Copper Exceedances

114.  For the Reporting Years 2016-17 the levels of Copper at 0.100 mg/L in storm water detected by the Facility has exceeded the benchmark value and annual NAL for Copper of 0.03 mg/L established by EPA and the State Water Board. For the Reporting Year 2017-18 the Copper level at the Facility was measured at 0.123 mg/L which is over the benchmark value and annual NAL for Copper. For the Reporting Year 2018-19 the Copper level at the Facility was measured at 0.081 mg/L which is over the benchmark value and annual NAL for Copper. For the Reporting Year 2019-20 the Copper level at the Facility was measured at 0.129 mg/L which is over the benchmark value and annual NAL for Copper. For the Reporting Year 2020-21 the Copper level at the Facility was measured at 0.085 mg/L which is over the benchmark value and annual NAL for Copper.

Iron Exceedances

115.  For the Reporting Years 2015-16 the levels of Iron at 2.065 mg/L in storm water detected by the Facility has exceeded the benchmark value and annual NAL for Iron of 1.00 mg/L established by EPA and the State Water Board. For the Reporting Year 2016-17 the Iron level at the Facility was measured at 6.900 mg/L which is over the benchmark value and annual NAL for Iron. For the Reporting Year 2016-17 the Iron level at the Facility was measured at 6.900 mg/L which is over the benchmark value and annual NAL for Iron. For the Reporting Year 2017-18 the Iron level at the Facility was measured at 2.745 mg/L which is over the benchmark value and annual NAL for Iron. For the Reporting Year 2018-19 the Iron level at the Facility was measured at 2.415 mg/L which is over the benchmark value and annual NAL for Iron. For the Reporting Year 2019-20 the Iron level at the Facility was measured at 8.990 mg/L which is over the benchmark value and annual NAL for Iron. For the Reporting Year 2020-21 the Iron level at the Facility was measured at 4.700 mg/L which is over the benchmark value and annual NAL for Iron.

Total Suspended Solids (TSS) Exceedances

116.  For the Reporting Years 2016-17 the levels of TSS at 136 mg/L in storm water detected by the Facility has exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Water Board. For the Reporting Year 2017-18 the TSS level at the Facility was measured at 121.075 mg/L which is over the benchmark value and annual NAL for TSS.

Zinc Exceedances

117.  For the Reporting Years 2015-16 the levels of Zinc at 0.198 mg/L in storm water detected by the Facility has exceeded the Basin Plan's parameters for Zinc of 0.26 mg/L. For the

Reporting Year 2016-17 the Zinc level at the Facility was measured at 0.812 mg/L which is over the Basin Plan's parameters for Zinc. For the Reporting Year 2017-18 the Zinc level at the Facility was measured at 0.463 mg/L which is over both the Basin Plan's parameters for Zinc and those parameters established by EPA and the State Water Board for Zinc. For the Reporting Year 2018-19 the Zinc level at the Facility was measured at 0.640 mg/L which is over both the Basin Plan's parameters for Zinc and those parameters established by EPA and the State Water Board for Zinc. For the Reporting Year 2019-20 the Zinc level at the Facility was measured at 0.473 mg/L which is over both the Basin Plan's parameters for Zinc and those established by EPA and the State Water Board for Zinc. For the Reporting Year 2020-21 the Zinc level at the Facility was measured at 0.300 mg/L which is over both the Basin Plan's parameters for Zinc and those established by EPA and the State Water Board for Zinc.

118.   On information and belief, EDEN alleges Defendant has exceedances for every Reporting Year since 2015-16 Reporting Year.

119.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron, TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

Failure to Conduct an Evaluation and to Submit Level 1 ERA Report
for Copper, Total Suspended Solids, and Zinc

120.   On information and belief, EDEN alleges that the Facility exceeded the EPA Benchmark NAL for Copper, Total Suspended Solids ("TSS"), and Zinc for the reporting year 2016-17.

121.   On information and belief, EDEN alleges that the Facility was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an *evaluation* of the Facility by

October 1, 2017, and to upload an adequate Level 1 ERA *Report* for Copper, TSS, and Zinc on or before January 1, 2018.

122.  On information and belief, EDEN alleges Defendant failed to conduct a Level 1 evaluation for Copper, TSS, and Zinc with the assistance of a QISP, to prepare a Level 1 ERA Report, and to upload it on to SMARTS system, a violation of the General Permit.

123.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron, TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

<u>Failure to Submit a Level 2 ERA Action Plan for Copper,
Total Suspended Solids, and Zinc</u>

124.  On information and belief, EDEN alleges that while Defendnat was in Level 1 status, the Facility again exceeded the EPA Benchmark NAL for Copper, TSS, and Zinc for the Reporting Year 2017-18. These results elevated Defendant to Level 2 status on July 1, 2018.

125.  The Facility was required to have a QISP certify and submit by way of SMARTS system a Level 2 ERA *Action Plan* that addresses each new Level 2 NAL exceedance at the Facility by January 1, 2019. On information and belief, EDEN alleges Defendant has failed to submit a Level 2 *Action Plan* for the Facility by uploading it onto the SMARTS system, a violation of the General Permit.

126.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron, TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

1

2

<u>Failure to Submit Level 2 ERA Technical Report for Copper,</u>
<u>Total Suspended Solids, and Zinc</u>

127.  On information and belief, EDEN alleges Defendant entered into Level 2 status on July 1, 2018, for the NAL Exceedance of Copper, TSS, and Zinc, thus requiring Defendant to prepare a Level 2 *Technical Report* by January 1, 2020.

128.  On information and belief, EDEN alleges Defendant has failed to submit a Level 2 *Technical Report* for the Facility by uploading it onto the SMARTS system, a violation of the General Permit.

129.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron, TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

<u>Failure to Submit a Level 2 ERA Action Plan for Aluminum and Iron</u>

130.  On information and belief, EDEN alleges that while Defendnat was in Level 1 status, the Facility again exceeded the EPA Benchmark NAL for Aluminum and Iron for the Reporting Year 2016-17. These results elevated Defendant to Level 2 status on July 1, 2017.

131.  The Facility was required to have a QISP certify and submit by way of SMARTS system a Level 2 ERA *Action Plan* that addresses each new Level 2 NAL exceedance at the Facility by January 1, 2018. On information and belief, EDEN alleges Defendant has failed to submit a Level 2 *Action Plan* on Aluminum and Iron for the Facility by uploading it onto the SMARTS system, a violation of the General Permit.

132.  Information available to EDEN indicates that as a result of these practices, storm

1   water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron,

2   TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek,

3   a tributary of the Russian River which is the "Receiving Waters" for the Facility.

4   <u>Failure to Submit Level 2 ERA Technical Report for Aluminum and Iron</u>

5   133.  On information and belief, EDEN alleges Defendant entered into Level 2 status on July

6   1, 2017, for the NAL Exceedance of Aluminum and Iron, thus requiring Defendant to prepare a

7   Level 2 *Technical Report* by January 1, 2019.

8   134.  On information and belief, EDEN alleges Defendant has failed to submit a Level 2

9   *Technical Report* on Aluminum and Iron for the Facility by uploading it onto the SMARTS

10  system, a violation of the General Permit.

11  135.  Information available to EDEN indicates that as a result of these practices, storm

12  water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron,

13  TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek,

14  a tributary of the Russian River which is the "Receiving Waters" for the Facility.

15  <u>Failure to Comply With The Mandates of The Regional Water Board</u>

16  136.  On information and belief, EDEN alleges that on December 2, 2019, Defendant

17  received from the Regional Water Board a "Notice of 2018-19 Annual NAL Exceedances . . ."

18  for Aluminum, Copper, Iron, and Zinc. This Notice was in the form of an order requiring

19  Defendant to preform certain actions, including making necessary changes to the Facility's

20  operations, amending the SWPPP, updating the Site Map, and incorporating new BMPs to

21  address the exceedances. The Water Board also required Defendant to demonstrate it compliance

22  by uploading onto SMARTS system the amended SWPPP and updated Site Map. The Water

23  Board also noted Defendant may be subject to administrative penalties assessed at rate of Ten

24

Thousand Dollars ($10,000) per day with the possibility of referral to the prosecutor's office for criminal charges if the order was ignored.

137.  On information and belief, EDEN alleges Defendant has failed to make the necessary operational changes, to amend the SWPPP, to update the Site Map, and to incorporate new BMPs to address the exceedances, thus violating the Water Board's mandate which is a violation of the General Permit.

138.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron, TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

Failure to Train Employees

139.  The General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

140.  Defendants failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

141.  On information and belief, Eden alleges that Defendant failed to appoint a Pollution Prevention Team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

142.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, Aluminum, Copper, Iron, TSS, and Zinc are being discharged during rain events from the Facility to the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

143.   Information available to EDEN indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  EDEN is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Failure to Implement Best Management Practices ("BMP") and the Best Available
Technology ("BAT") and the Best Conventional Technology ("BCT") at The Facility

144.   EDEN is informed and believes that Defendant has failed, since at least the beginning of the Facility's operations, to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment ("BCT") for conventional pollutants, and best available technology ("BAT") for toxic and non-conventional pollutants, a violation of the General Permit, sections I(C) and V(A). These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

145.   Information available to EDEN indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  EDEN is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

1

2

**FIRST CAUSE OF ACTION**
**Failure to Develop an Adequate Storm Water Pollution**
**Prevention Plan and Site Map**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

3

4

146.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

5

6

147.   The General Permit requires dischargers of storm water associated with industrial

activity to develop and implement a SWPPP.

7

8

148.   As outlined herein, Defendant has failed to develop and implement an adequate SWPPP

or Site Map for the Facility. The absence of requisite SWPPP and Site Map are ongoing and

9

continuous violations of the Act.

10

149.   Each day since at least the beginning of the Facility's operations, that Defendant failed

11

to develop an adequate SWPPP and Site Map for the Facility is a separate and distinct violation

12

of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

13

**SECOND CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

14

15

150.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

16

herein.

17

151.   The General Permit requires dischargers of storm water associated with industrial

18

activity to have developed and be implementing a monitoring and reporting program (including

19

sampling and analysis of discharges) that complies with the terms of the General Permit.

20

152.   As outlined herein, Defendant has failed to develop and implement a monitoring and

21

reporting program for its Facility.

22

23

24

1
2
3

153.  Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

4
5
6
7
8

154.  Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

9
10
11

**THIRD CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

12
13

155.  Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

14
15
16
17

156.  The General Permit's SWPPP requirements and Effluent Limitation Section V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

18
19
20
21
22

157.  Defendant failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Total Suspended Solids ("TSS"), Aluminum, Copper, Iron, and Zinc and other potentially un-monitored pollutants, in violation of Effluent Limitation Section V(A) of the General Permit.  The absence of requisite BAT and BCT are ongoing and continuous violations of the Act.

23
24

158.   Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

159.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

160.   Discharge Prohibition Section III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

161.   Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI(A) and Discharge Prohibition Section III(D) of the General Permit.

162.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with the pollutants of pH affected substances, Total Suspended Solids ("TSS"), Aluminum, Copper, Iron, and Zinc and other potentially un-monitored pollutants at levels above applicable water quality

standards. The storm water then flows untreated into the Mark West Creek, a tributary of the Russian River which is the "Receiving Waters" for the Facility.

163.  Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

164.  Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

165.  Every day since at least the beginning of Facility's operations, that Defendants have discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Failure to Properly Train Facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

166.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

167.  Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

168.   Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

169.   Since at least the beginning of Facility's operations, Defendant has failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein and is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## SIXTH CAUSE OF ACTION
### (Recovery Under the Catalyst Theory CCP §1021.5)

170.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

171.   Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs.  *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

172.   A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendants prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit "A"

and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

173.  In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

174.  Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendant to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP, an updated Site Map and implemented appropriate BMPs;

4.      Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6.     Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.     Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.     Award such other and further relief as may be just and proper.


Dated:  May 13, 2022          Respectfully,


By:  */s/ Craig A. Brandt*
        Craig A. Brandt
        Attorney for Plaintiff